This morning is 09-1284 Clearwater Systems v. Evapco. Mr. Grandinetti. Good morning. May it please the court. If I may, I'd like to start off by discussing just a few points about the 739 patent. That's the patent directed to a method that produces an oxidizing agent. Judge Underhill found the claims to be invalid for basically inherencing. It's correctly stated in the judge's opinion that you cannot get a patent for unappreciated properties or scientific explanations. We understand that. The definition, of course, of unexpected properties is that it's something that's necessarily present, but if it's something that has occasional results, it's not inherent. And we, of course, discuss that in our briefs. Before going into some detail, one of the things that is important to recall is that in the patent itself, and this is in JA-129, at the bottom of the first column and the top of the second column, the applicants told the examiner about these devices being out in the economy, being used in cooling towers, and also disclosed the 267 patent, which discusses the preferred embodiment of the devices. The claims of the 739 patent, however, do require the formation of an oxidizing agent as well as providing that oxidizing agent in a biocidally effective amount. Clearwater's position is that the formation of an oxidizing agent may or may not be inherent to the operation of these devices. There's some question as to whether or not all these devices make oxidizing agents or not. What do you mean by all of them? There's a number of different brands and there's a number of different models of these non-chemical water treatment devices. Right, right, but your method patent isn't being anticipated by an object, right? It's being anticipated by a product patent and the disclosure in the patent. The disclosure of the 267 patent, yes. I thought the argument of the district court and your adversary here is that when you crank up your product, you get the results that you claim in the method. Well, that's it. But if that's so, then what's wrong with the judgment from which you're appealing? Well, you don't necessarily get what's claimed in the method. The production of an oxidizing agent may or may not be occurring in one of these devices. But if you have, for example, one of these devices sitting in this room, and you're pumping water in on one end and it's coming out the other, it's spilling on the floor. But again, you're talking about devices. I mean, don't you have to concede that there's at least one device that meets the limitations of the apparatus claim that produces the results of the method? One device alone isn't going to meet those standards. But again, don't you have to look at what happens when you take a product that's made pursuant to the apparatus patent and you crank it up, and if it produces the result of the method, I would think that's a good story. That's the point, is if you have simply the device operating and you're pumping water through it, it doesn't produce the result, it doesn't produce the claimed method. It may or may not be producing an oxidizing agent, but there's no evidence, there's no facts that show that these devices can produce enough oxidizing agent alone in a sufficient concentration. The claim actually requires a biocidally effective amount, and that is something that only occurs occasionally. If you assume for a moment that all these devices make oxidizing agents, that's fine. But once again, there are no facts that show that just passing water through them alone is going to get you a concentration that's effective. That's what makes the claim different from the disclosure of the 267 patent, is something more is required. You have to have that biocidally effective concentration. Without the concentration, it's meaningless. The amount of oxidizing agent produced by these things, especially with just one pass of water through it, is negligible. It can't be measured. How is the biocidal agent measured? How is it measured? What is there to measure it? Unfortunately, the measurements that are known at the time the patent was drafted are basically taking samples of water and testing it against bacteria and seeing whether or not there's an effect. There were a lot of efforts made to actually analyze what oxidizing agent is it and what concentrations is it in, but they couldn't do it. They took it to a university and had a number of studies done that couldn't do it. The other thing is, is every time they set up a lab model and they tried to reproduce the results, they had failures. The occurrences of an effective concentration are very haphazard. They're very occasional, and that's what the color exhibit, which is in the joint appendix, that's what it shows. It is more likely than not you're not going to have enough of an effective concentration even if you attach one of these devices to a system like a cooling tower. Now, not all the claims require a cooling tower arrangement, but if you attach one of these devices to some sort of a system where you can concentrate the oxidizing agent over time, then you end up with the required element, which is the biocidally effective amount. Did I answer your question? Well, my question is, that goes to the efficacy of the system. Does it have to start off at zero and reach a certain number over a time period? If it does, then what is that time period and what is that number? Before we can say that it is effective. There's no specific time period that's known. The operation of this device in certain systems will produce a concentration where the water will have an ongoing effect even after the water is removed from the system. It will kill bacteria. But the amount of time it takes to operate it is actually dependent on the system that the device is in. There's a great variation. Once again, the different towers that were examined by Dr. Oppheim show this. There's a great variation between systems, and sometimes having identical systems in the same yard, the same physical facility, you get different results. So not everything is understood. So what does he attribute that to? The size of the tank? The volume of the water? There was a great deal of work when he first started. You have to remember, Dr. Oppheim has Alzheimer's. Some of what I'm saying now, I had the benefit of sitting down with him privately with his wife, and we had some conversations when he was lucid one day. When he first started this project, he actually believed that it was the environment that had something to do with it, and the proximity of the tower to, say, the stacks in one of these manufacturing facilities. And he went on to sample a wider variety of facilities, and he ruled that out. But when this does occur, he couldn't at that time always say why it occurred. But the system has to be such that it operates long enough to build up a concentration. And then once the concentration is there, you can actually remove the water and take it out and take it back to the lab. You can store it in the refrigerator for a few days, and then that water will kill bacteria. Does that answer your question? Your Honor? Yes. I'm sorry. Anyway, the device alone isn't sufficient to create that concentration. So if you assume that the presence of the oxidizing agent is necessarily present and inherent in the operational— Well, when you say the device alone is not, what you mean is it's not every device, not all the time. I thought you said earlier that some of the devices do produce the concentration sufficient to have an effective biocidal effect. That's correct. Let's assume for a moment, arguendo, that all of them produce some oxidizing agent. That's not been shown, but if we assume it for a moment and the oxidizing agent is inherent to the operation of the device, what is not inherent is the method where that oxidizing agent is concentrated to an effective amount. That's what is occasional. And that's what makes the claims different from the 267 disclosure. Well, Claim 1 claims the concentration is sufficient to have a biocidal effect, right? Correct. Claim 10 doesn't, does it? Claim 10— Just form a stabilizing oxidizing agent. Yes, you have to operate for a period sufficient to form the stabilizing oxidizing agent. Is a stabilizing oxidizing agent one that is in a concentration sufficient to have a biocidal effect? That's correct, and that is discussed in the patent in Column 7. The terminology, stabilized oxidizing agent, is basically referring to the effect of concentration. The only other things I'd like to point out about this patent is that the claims were not individually determined. Only some of them are limited to cooling towers. Well, isn't it worse than that? I mean, doesn't footnote 5 in the district court's judge's opinion reflect an incorrect statement of the law? No, I don't believe it does. Well, he said in footnote 5, he said if the independent claims are invalid, all the dependent claims are too. That's not a correct statement of the law. No, I don't think that is. I'm sorry. I mean, that's your argument, isn't it? I mean, even if we were to affirm on the independent claims you're entitled to, your dependent claims haven't been tested? That is the argument, but also, for example, Claim 16 is much more specific to cooling towers. And I think the judge's focus was on the evidence that came in from cooling towers, because that seems to be a system where when it occurred, you had an effective concentration. Well, let's hear from the other side now. We'll give you your full rebuttal time, which you've used half of already. Okay, I'm almost done. The only other thing is, on this patent, I'd like to point out that— Let's hear from the other side. I'll give you a couple minutes to come back. Good morning, Your Honors. Alex Hadgis of Morrison & Forrester for a clear report. Hivacko with Mr. John Land. May it please the Court, I'd like to address the 267 patent first, unless Your Honors would like for me to get into the 739 patent first.  You don't mind. I mean, your adversary has made an argument here that the judgment of invalidity on the method patent was incorrect because in order to have anticipation by inherency, the method of the 739 patent has to be produced every time you crank up the product. And he said that's not so. And what's your response? We clearly disagree with that. Well, on what basis? Well— Where is the proof? For the 739 patent, there are two sets of prior art. One set, as Your Honor has recognized, is a set of devices, the Dolphin devices. These devices undisputedly existed prior to the patent. They're undisputedly prior art devices. They also undisputedly perform the method claimed in the patents. On which? The issue there is reliability or repeatability. According to Clearwater, some of them didn't work. And the chart that Clearwater has in the court today, which is in the joint appendix, shows both points. The first point being that nobody disputes that even under Clearwater's measure of success, which is a measure that they've created their own benchmark, the devices work 40% of the time. If you look at other measures of success, one log, they work over 75% of the time. But the point is immaterial. The point is that everybody agrees that these prior art devices operated and they performed the method that's claimed in the 739 patent. Now, as for all of them— So your argument would be that it's only one of the devices produces the concentration sufficient to have a biocidal effect, then that's enough. That's right, Your Honor. It's a matter of law. Just as a device that infringes after invalidates or anticipates if before. You don't need full-time infringement. You don't need full-time invalidation. In fact, if we apply a rule that said the device had to be perfect and work every time perfectly, and that wasn't claimed, there would be no devices that would invalidate patents because we live in an imperfect world. This is just merely an implementation of the patent itself as described. But then it would have to be effective. It is effective at least 40% of the time, even by their measure. The inventor created— What you're saying is from the time that the product patent issue, really from the time it was filed, the method was in the air. The method existed. The device to perform the method existed, and the method existed. That device was operated, and it performed that method. And the inventor himself, Dr. Oppheim, took those notes and confirmed its operation and that the device worked as described and claimed in the 739 patent. And there's no dispute about that. The only issue is the reliability issue. And as a matter of law, as in the Hewlett-Packard case, the device does not have to be perfect. It does not have to operate well. It does not have to operate all the time. It just needs to operate some of the time. And we cited that case in our briefs. Well, hypothetically, though, if it operated 1% of the time and it was totally ineffective for the purpose, then it would not be operating, would it? Don't you still need to have a scale as to what it is from the beginning to the end as to what effectiveness the biomedical aspect of it is? Your Honor, when I'm referring to operating some of the time or all the time, in the context of the Dolphin devices that are at issue here, I am referring to effectively operating. There's no dispute that the Dolphin device effectively operated at the prior hour time, at least under their measure of effective operation, 40% of the time. So that's undisputed. There is effective operation of that device. It did perform the claimed method. No one disputes that. They're making an inherency argument. Inherency doesn't apply to an actual device. Inherency applies to a written record, a written piece of prior art, that has an ambiguity in it, a gap in it, a hole in it. And the Inherency Doctrine asks, how do you decide whether that reference invalidates, in an anticipatory fashion, a claim? Is that hole necessarily filled with something that's claimed in the claim or not? This is not a question of inherency when it comes to the Dolphin. The question of inherency is about the 267 patent. And on that score, the 739 itself, as we've briefed, indicates expressly that the device described in the 267 performs the method that's claimed in the 739. That's the preexisting phenomenon and the subsequent discovery that's described in the 739 patent. For that reason, as a matter of law, the 267 patent reference, the document itself, invalidates the 739 patent. Separately, the Dolphin devices invalidated that patent because they performed that method undisputably prior to the prior art data, the 739 patent. It's important to keep in mind that we're talking about two separate pieces of prior art, and the inherency doctrine does not apply to both of them. Clearwater is trying to bleed the inherency argument into the actual device operation, but the Hewlett-Packard case and the law of this court indicate that a prior art device doesn't need to invalidate claims every time. It just needs to invalidate claims. Wasn't the trial court looking at this as an inherency issue? Excuse me, Your Honor. Wasn't the trial judge looking at this as an inherency issue as opposed to a prior art device anticipating not by inherency but in fact? The trial court did, as I read the opinion, address inherency as it pertained to the 267 patent reference. These arguments, however, that we presented to Your Honors and to the court were presented to the court below, and I believe the court also understood that the Dolphin itself, the actual devices performed. But you wouldn't know that by reading the opinion. Your Honor, the district court did not, as I read the opinion, directly address the Dolphin device. However, the district court was presented with our evidence, claim charts, and the arguments that were made at court. Are you sure that the argument was made? Yes, absolutely. Absolutely? Yes. Well, your 267, which I'm sorry I interrupted you because you wanted to talk about the 267. In terms of the high-frequency circuit, pardon me, on the low-frequency, what I was curious to know is on the low-frequency circuit, it looked to me like the trial judge had overlooked your adversary's reference to the K3 switch and Mr. Hornstein's affidavit. No, I don't think so. He relied on the fact in saying that there's no infringement there. He said, well, you know, your product is using diodes and not a switch as the switch is defined for purposes of the claim construction. Exactly. And so on summary judgment, he said, sorry, there's no infringement. And your adversary was saying, hey, wait a second. And I had an expert here, Hornstein, who said, regardless of whether you're using diodes or not, there's a K3 switch in here that does the trick. And Hornstein's affidavit, as I read it, actually does make up the functioning of the K3 switch to the limitations in the claim, interrupting the current as it's supposed to do. So how can you have a summary judgment where there's an expert's affidavit in that says there is a switch in the K3? Your Honor, the district court did not ignore the affidavit. The district court did not ignore the K3. The district court did not ignore the argument. So he hinges it all on Clearwater's Rule 56A2 statement at paragraph 70 on diodes. Isn't that right? Page 19 of the opinion, JA67. Parties don't dispute that the low-frequency circuit contains diodes through which current passes. Because it doesn't contain structural components which connect and enable a switch to open and close. Well, Hornstein disagreed with that, didn't he? He did cite 70 in support in his opinion. That's right. There are two points that respond to this issue and this question. Number one, yes, Dr. Hornstein did point out the K3 switch. If you look at the record JA5738, you've got the record 5738 and 39. That's where Hornstein is talking about the K3 switch. Right. The K3 switch is a master on-off switch for the pulse-pure device. In other words, when the device is started up, that switch is toggled to turn the device on. The device continues to operate just as you turn on a light and the light continues to operate. The K3's responsibility when the device is shut down is to turn the device off. Just like when you leave the room, the light switch is flipped to turn the light off. The switch that's claimed in the 267 patent has specific requirements for it. The requirements are that switch has to let current flow through the coils. If you look at 5738, where Hornstein is telling us what he thinks the K3 does, it sure looks to me like he's saying that the K3 is doing more than flipping the lights on and off when you go in and out of the room. I don't think he says that. He says that when you flip the K3 switch... Why don't you look at it, 5738, and then explain to me why in paragraphs F, G, and H, the expert at least isn't saying, maybe he's wrong, but he's saying that the K3 switch is performing the claimed function. There is no dispute about how the pulse-pure works. The expert is saying that when you flip the K3 switch on... Do you have the record there? I do, Your Honor. Current ultimately flows through the coils. And when you flip the K3 switch off, current stops flowing through the coils. When K3 is open, coils 2 and 3 form a series resonant circuit with their mutual capacitance and capacitators. That's what he's telling us it does, right? Apparently so, Your Honor. And when it's in its closed condition, the current is positive, and current will flow through the coils and on forward via the diode. Isn't that what the switch is supposed to be doing in the claim? No. The switch, as claimed, is required to allow current to flow through... You may disagree with Hornstein. You may think he doesn't know what he's talking about. My simple point is whether or not summary judgment was correct on the switch limitation in the light of Hornstein's affidavit on the K3 switch. Right. On the switch alone, the summary judgment, our position, was correct. There are other reasons... Because you used diodes. We used diodes, and we don't have a connecting mean circuit. The lack of a connecting mean circuit is a self-standing reason. We don't have a switch that is toggled by a circuit to turn it on and to turn it off as required by the claims at a selected time period. However, the claims themselves, as they functionally require the switch to operate, do not cover the switch that Dr. Hornstein is looking at, even assuming what he says. And, Your Honor, the point here is that the claims require, and I'll quote in Claim 21, such that during each half cycle of at least one of two sets of half cycles, current due to said source power flows through said coils during at least a portion of said half cycle, because of said first and second terminals of said switch being in said closed condition relative to each other. That switch is not turned on and off to allow current to flow at least part of the time. It's the at least part of the time that's not met by that current. And that's not addressed by Dr. Hornstein in his report or declaration. Can I go back and ask you one question on the invalidity argument? It looked to me like what the trial judge did in the footnote 5 in his opinion was to say, because dependent claims depend from independent claims, if I invalidate an independent claim, I'm going to invalidate the dependent claim. And that's incorrect, isn't it? That is incorrect, Your Honor. So at the least, there is grounds to think that the case needs to be remanded. We assume that we affirm the anticipation of judgment on the independent claims. There certainly hasn't been any assessment of whether, I mean, the reason why you have a dependent claim is to separate yourself and make your claim narrower than the independent claim. We obviously understand the law, and we agree with Your Honor's analysis of the difference when it comes to validity determinations between dependent claims and independent claims. However, we do not agree that at least it would be proper to remand it. Well, has there been any adjudication of the validity of the dependent claims? There has. We believe that there has. Where? In the opinion? Your Honor, on appeal. Where in the opinion? There didn't need to be in the opinion, because it wasn't the limitations in the dependent claims. Anticipation is a question of fact, isn't it? It is, Your Honor. And so we're supposed to make a factual judgment about the dependent claims? The facts that pertain to the limitations in the dependent claims were not disputed below. The only argument that was presented by Clearwater is the same argument that was presented by Clearwater to you in this case, and that is that the pulse purer, or that the prior art, did not have a concentration sufficient to have a biocidal effect. If you look at the briefs, that's the only argument presented in this appeal to you. That was the only argument presented to the district court judge. We submitted claims... But they don't have the burden of sustaining the validity of their dependent claims. Excuse me? The burden of going forward, or the burden of... There's no burden lies on the back of the patentee to defend the validity of his dependent claims. We... You have to challenge. And we did that. We filed a motion for summary judgment on all the claims. And in the motion, we submitted argument pointing to evidence that the limitations in the dependent claims existed as a matter of law. No dispute of fact about these limitations. Clearwater responded by making one argument, and that argument pertains to the concentration of the peroxide to create a biocidal effect. That's the argument that's in the independent claims. They took a silver bullet response. They did not argue, because they couldn't, that the other limitations weren't met. The district court had one issue posed to it. It was that one. It also had our briefs and Clearwater's briefs, which showed that the other limitations were not disputed. The facts pertaining to the other limitations were not disputed. We submitted that evidence. So you're saying the case was actually sort of treated like it was coming from the PTO, where frequently the parties agree to have all the claims rise with all on a single claim. And we see that in PTO appeals from time to time, where there's an independent claim and a bunch of dependent claims, and the whole case rides on the independent claim. The district court decided the validity issue before it, and that validity issue did not save, or could not save, the dependent claims once it was decided in our favor. Thank you. Mr. Vanden Heg? Thank you, Your Honor. Actually, I have really nothing else to say. I'm willing to close my argument at this point, unless there are some questions. Do you disagree with what we just heard from Mr. Hedges about the dependent claims? I think I do disagree. Unfortunately, I would like to look at our response brief one more time. I'm not sure that we waived the dependent claims when we argued. I don't think we did that. I think we may have grouped some of them. But regardless, I know that Dr. Hornstein, in his declaration, addressed each of the elements that you find in those claims, and that we presented evidence to each one. But as I stand here, I can't say how I addressed the— But it makes a difference, doesn't it? The dependent claims make a difference, yes. No, no, no. The point is that if the other side asserted invalidity of all the claims, including the dependent claims, and made specific references to why the dependent claims were also anticipated because of fire art, and you only chose to respond with regard to the independent claim and the sufficiency limitation, then you would not have preserved the issue, right? That's why you want to look at the response. Yeah, I can't imagine that we didn't respond to it. Thank you. Thank you. Case is submitted.